OPINION OF THE COURT
Leonard D. Steinman, J.
On April 17, 2012, plaintiff E.C. (husband) filed this action for divorce from his wife of 26 years, defendant L.C. (wife). Husband seeks a judgment of divorce incorporating a marital separation agreement and property settlement agreement dated April 12, 2010 (the agreement). Wife has asserted counterclaims and also seeks a judgment of divorce, but on different terms. *1052 Wife asserts the agreement should be disregarded on various grounds and demands an equitable distribution of the parties’ marital property, maintenance, child support and additional relief.
On February 6, 2013, this court denied wife’s motion for summary judgment and ordered a hearing to determine the validity of the agreement. The hearing was held on May 13, 17, 21 and 29, 2013. At the conclusion of the testimony the court reserved decision pending the submission of post-hearing memoranda, which were submitted by both husband and wife on June 18, 2013.
The court finds, for the reasons set forth below, that the parties’ agreement is valid and enforceable. Wife has not sustained her burden of establishing that the agreement was abandoned, was induced by fraud or was the product of overreaching.
Facts
The parties were married on June 7, 1986. They have three children, ages 24, 20 and 19. Husband is 55 years old and works as a computer technician for Hitachi, where he earns approximately $90,000 per annum. He has an Associate’s degree from the State University of New York at Farmingdale.
Wife is 52 years old and is employed by Hofstra University as an administrative assistant, where she earns approximately $27,000 per annum. Wife has a Bachelor of Arts degree from Hofstra University. At the time of the parties’ marriage in 1986, wife was employed as an ad buyer for Doyle Dane Bernbach earning $30,000 per annum. In January 1990 wife left that position to concentrate on raising the parties’ children. Wife began working for Hofstra as a part-time secretary in 2001 and began working on a full-time basis in 2003. Because of her position at Hofstra, all of the parties’ children have attended college there tuition-free. In addition to her job at Hofstra, wife is a licensed real estate broker. In 2010, wife earned approximately $20,000 in real estate commissions (before expenses). In 2011, this amount decreased to approximately $8,200.
The parties’ marriage broke down in January 2010 when husband became convinced that wife was having an affair. One evening, wife did not return to the marital home and husband caught her lying about her whereabouts. When confronted, wife suggested that the parties divorce. In response, husband suggested that the parties return to a marriage counseling retreat they had visited in 2009. Wife demurred and moved out of the marital bedroom.
*1053 Two or three weeks later, wife followed up on her suggestion that the parties divorce and handed to husband a copy of the agreement. Wife utilized a form agreement that she obtained from an Internet website. Wife suggested to husband that they immediately sign the agreement and then convert the agreement into a divorce when their youngest child graduated high school, in approximately two years.
Husband, still hopeful that the parties could reconcile, did not review the agreement immediately. The following month, he approached wife and let her know he would sign it. Husband made and requested no changes to the agreement. Neither party made any financial disclosures to the other. There was no attorney involvement. Two days later, on April 12, 2010, the parties separately drove to a bank and before a notary public together signed the agreement. That very day, wife filed the agreement with the Nassau County Clerk’s office.
Discussion
New York law protects the rights of parties to enter into agreements relating to their marital relations. (See Domestic Relations Law § 236 [B] [3] [“An agreement by the parties, made before or during the marriage, shall be valid and enforceable in a matrimonial action”].) Duly executed separation agreements are generally valid and enforceable. (Van Kipnis v Van Kipnis, 11 NY3d 573 [2008].) When presented with legal challenges to marital agreements, our courts have recognized that there is a “strong public policy favoring individuals ordering and deciding their own interests through contractual arrangements.” (Bloomfield v Bloomfield, 97 NY2d 188, 193 [2001], quoting Matter of Greiff, 92 NY2d 341, 344 [1998].) “Judicial review is to be exercised circumspectly, sparingly and with a persisting view to the encouragement of parties settling their own differences . . . .” (Christian v Christian, 42 NY2d 63, 71 [1977].)
While the law has long favored marital agreements and seeks to uphold them (see De Cicco v Schweizer, 221 NY 431, 439 [1917]), marital agreements are not immune from the public policy considerations that engage the attention and oversight of the courts. (See Matter of Greiff, 92 NY2d at 345 [marital agreements are not insulated from “typical contract avoidances”].) Courts have “thrown their cloak of protection” over marital agreements “to see to it that they are arrived at fairly and equitably, in a manner so as to be free from the taint of fraud and *1054 duress, and to set aside or refuse to enforce those born of and subsisting in inequity.” (Petracca v Petracca, 101 AD3d 695, 697-699 [2d Dept 2012], quoting Christian v Christian, 42 NY2d at 72.)
Wife makes three arguments in support of her assertion that the agreement is unenforceable: (1) the parties abandoned the agreement; (2) the agreement is the product of overreaching; and (3) she was fraudulently induced into signing it.
A. Abandonment
A sine qua non of a valid separation agreement is a separation of the parties. The separation must exist at the time of the agreement or follow immediately thereafter. (LaMontagne v LaMontagne, 239 App Div 352 [1st Dept 1933].) As a matter of public policy, a separation agreement must merely recognize and not induce the breakup of a family unit. (See Matter of Wilson, 50 NY2d 59, 63 [1980]; Tirrell v Tirrell, 232 NY 224, 228-229 [1921].) The law’s insistence that the separation is a present or imminent fact removes any doubt that the agreement itself may cause or trigger a future separation.
Furthermore, in the absence of reliable indicia to the contrary, a failure to separate after the execution of a separation agreement constitutes an implied revocation of the agreement and the property dispositions contained therein. (Matter of Wilson, 50 NY2d 59, 66 [1980].) This is because when marital property arrangements are made part of a separation agreement, the separation is considered the underlying raison d’etre for the dispositions.
Here, wife argues that the parties’ relationship before and after the agreement was signed remained substantially similar— thus demonstrating an abandonment of the agreement. Since the parties continued to conduct themselves as a married couple after the execution of the agreement, wife asserts, “it may be deemed a resumption of the marital relationship evincing an intent to abandon the agreement.” (Defendant’s posttrial mem at 1; see Rosner v Rosner, 66 AD3d 983 [2d Dept 2009].)
But the facts are to the contrary. After the parties executed the agreement, wife moved out of the marital bedroom. The parties never again engaged in sexual relations. When the parties thereafter went on a vacation to Universal Studios with their child they slept in separate bedrooms. In 2009 and years prior, the parties filed their taxes jointly; in 2010 and 2011, after the execution of the agreement, the parties filed individual *1055 tax returns. Four months after the agreement was signed, husband did not go to wife’s 50th birthday party. Wife did not attend husband’s father’s 95th birthday party, the wake following husband’s father’s death or the weddings of husband’s cousin and nephew. The family stopped sharing meals. Husband and wife threw separate high school graduation parties for their son. The parties purposely waited until shortly before their son graduated high school to inform him of their separation and to file a divorce complaint, but they each told their siblings, parents and certain friends of their separation shortly after the agreement was signed.
Although certain aspects of the parties’ financial relationship did not change, such as the continued existence of a joint bank account, this was done for the convenience of the parties. Furthermore, although not every aspect of the agreement was slavishly followed, this is not surprising considering the agreement was the product of an Internet form and not tailored to the parties’ particular circumstances. Importantly, the parties did wait until their youngest son graduated high school before putting their marital residence up for sale; the parties’ cars were utilized and dominion was exercised over them as agreed; and even wife concedes that they lived separate private lives. As a result, this court finds that the parties did in fact separate and the agreement was not abandoned.
B. Overreaching
Prior to the Court of Appeals’ decision in Matter of Greiff (92 NY2d 341 [1998]), it was presumed that the party seeking to vitiate a marital contract based upon fraud or overreaching bore the burden of proof. (Matter of Phillips, 293 NY 483, 490-491 [1944]; Matter of Sunshine, 51 AD2d 326, 327 [1st Dept 1976], affd 40 NY2d 875 [1976].) In Greiff, the Court of Appeals instructed that in determining the parties’ respective burdens where a marital agreement is challenged, courts should decide whether the “nature of the relationship between the couple at the time they executed their . . . agreement ] rose to the level to shift the burden to the proponent ] of the agreement [ ] to prove freedom from fraud, deception or undue influence.” (Matter of Greiff, 92 NY2d at 347.) The spouse contesting the agreement must establish a fact-based, particularized inequality before a proponent of the agreement “suffers the shift in burden to disprove fraud or overreaching.” (Id. at 346.)
Here, there is no basis to shift the burden of proof from wife to husband. Wife failed to provide any evidence that their *1056 marriage was an unequal partnership dominated by husband or that he exerted any outsized influence over her. Importantly, it was wife who initiated the parties’ separation and the execution of the agreement. Although wife claimed at trial that she feared husband and asserted incidents of domestic violence took place in 2008 and 2009, there was no evidence of police involvement and wife testified that she never informed or sought assistance from her brother, a former police officer, who resides on the same block as the parties. And just one month prior to the agreement’s execution wife purchased for herself a new car without consulting husband, utilizing the parties’ home equity credit line. Wife thus demonstrated her independence. Therefore, to succeed on her claim of overreaching wife must prove that the circumstances leading to the execution of the agreement led to a manifestly unfair and inequitable bargain. (See Barocas v Barocas, 94 AD3d 551, 551 [1st Dept 2012] [“(i)f the execution of the agreement ... be fair, no further inquiry will be made” z(quoting Levine v Levine, 56 NY2d 42, 47 [1982])].)
Wife has failed to meet her burden. There was no evidence establishing that the circumstances surrounding the execution of the agreement were inequitable. The agreement signed by the parties was drafted by wife, from an Internet form, without any changes made or requested by husband. It was executed only after husband agreed to do so at wife’s request, a month after wife presented it to him. Each party separately drove to the same bank to execute the agreement and wife took the initiative to file it with the County Clerk.
Although wife was not represented by counsel, the absence of independent legal representation, without more, does not establish overreaching or require nullification of an agreement. (Levine v Levine, 56 NY2d 42 [1982]; Forsberg v Forsberg, 219 AD2d 615 [2d Dept 1995].) Husband also did not have legal counsel.
There was no evidence presented that husband concealed or misrepresented to wife any financial information. Wife had full access to the parties’ banking information. Financial disclosure was not requested by either party. The parties’ agreement provided that the parties would either exchange financial statements and documentation or agree not to do so. It is clear that they chose the latter course. This is permissible. (See Berman v Berman, 217 AD2d 531 [2d Dept 1995].) In all events, the failure to provide full financial disclosure, by itself, does not invalidate an agreement. (See Cohen v Cohen, 93 AD3d 506 [1st *1057 Dept 2012]; March v March, 233 AD2d 371 [2d Dept 1996] [failure to disclose existence of retirement plan not grounds to set aside agreement dividing marital property].)
Nor do the terms of the agreement, including wife’s waiver of maintenance, give rise to any inference of overreaching. (Cf. Petracca v Petracca, 101 AD3d 695 [2d Dept 2012].) Wife, a college graduate, worked before and during the marriage, currently earning her salary from Hofstra as well as additional income as a licensed real estate agent. Thus, her waiver of maintenance cannot be viewed as unconscionable.
The parties owned a residence in Mineóla, New York, that, pursuant to the agreement, was sold and the proceeds were equally divided. The parties agreed that wife would maintain ownership of the parties’ then new Nissan Versa, which was fully paid for utilizing funds from the parties’ home equity line of credit; husband kept the lease on the 2008 Nissan Sentra. The parties agreed to sell their principal asset, the marital home, upon the high school graduation of their youngest child and equally divide the proceeds. This equal division is to take place notwithstanding husband’s potential claim for a separate property credit stemming from his premarital ownership of the parties’ prior residence, which was sold and the proceeds of which were used to purchase the current marital residence.
The agreement provides that husband is to pay 100% of the carrying charges of the residence until sold and that he can have exclusive occupancy. Husband abided by his obligation to pay the carrying charges (albeit, prior to the institution of this action, from a joint account into which wife also contributed), but did not exclude wife from the home. The home has now been put on the market for sale.
In sum, neither the terms of the agreement nor the circumstances surrounding its execution evidence overreaching on the part of husband. As a result, this court may “not intrude so as to redesign the bargain arrived at by the parties on the ground that judicial wisdom in retrospect would view one or more of the specific provisions as improvident” or imprudent. (Christian v Christian, 42 NY2d at 72.)
C. Fraudulent Inducement
Wife claims the parties never intended to utilize the agreement as a final document to be incorporated into a divorce judgment. She argues that she was fraudulently induced into signing the agreement by husband’s promise that it would be *1058 modified to incorporate various financial terms, such as the payment of maintenance and child support, when the parties divorced. In support of her assertion, wife points to the absence of such financial obligations of the husband in the agreement as well as the parties’ attempt to mediate their present dispute prior to the institution of this action. She testified that the parties could not agree on the terms of such support, thus leading to the current litigation.
To be sure, a marital agreement, like any other contract, may be vitiated if induced by fraud. (See e.g. Cioffi-Petrakis v Petrakis, 103 AD3d 766 [2d Dept 2013].) To succeed on such a claim wife must also allege and establish the basic elements of a fraud claim: representation of a material existing fact, falsity, scienter, deception and injury. (New York Univ. v Continental Ins. Co., 87 NY2d 308, 318 [1995].) She has not done so.
In contrast, in Cioffi-Petrakis, a prenuptial agreement was found to be invalid as a result of husband’s oral promise to tear it up after the parties had children. Although the Second Department’s decision has been characterized by some as a “landmark ruling,”[1] it is consistent with long-standing New York contract and fraud law and does not assist wife in the present instance (or, likely, most future litigants seeking to undo marital agreements).
A promise made with a preconceived and undisclosed intention of not performing it may be viewed as a misrepresentation of a present material fact sufficient to maintain a claim of fraud independent of a contract. (See Sabo v Delman, 3 NY2d 155 [1957]; Brown v Lockwood, 76 AD2d 721, 731-733 [2d Dept 1980].) The trial court in Cioffi-Petrakis cited to Sabo and explicitly based its decision on this principle of law. (E.C.-P. v P.P., 33 Misc 3d 1233[A], 2011 NY Slip Op 52221[U] [Sup Ct, Nassau County 2011].) The court did not change or extend the principles of law under which marital agreements are typically analyzed: unconscionability and overreaching. Indeed, the trial court and the Appellate Division previously rejected a challenge to the Cioffi-Petrakis agreement on such grounds. (See Cioffi-Petrakis v Petrakis, 72 AD3d 868 [2d Dept 2010].)
What makes Cioffi-Petrakis distinctive is that the plaintiff was able to successfully plead and prove that the husband’s promise was false when made. Such successes are rare in any *1059 type of contract dispute. The lawbooks are replete with attempts that fell short. (See e.g. Stangel v Zhi Dan Chen, 74 AD3d 1050 [2d Dept 2010]; McGee v J. Dunn Constr. Corp., 54 AD3d 1010 [2d Dept 2008].) This is because general allegations that a party entered into a contract while lacking the intent to perform it are insufficient. (New York Univ. v Continental Ins. Co., 87 NY2d at 318; Treeline 990 Stewart Partners, LLC v RAIT Atria, LLC, 107 AD3d 788, 791 [2d Dept 2013].) Parties typically lack the evidence courts require to sustain such claims. Plaintiffs uncommon success in Cioffi-Petrakis was magnified because it occurred in the context of a challenge to a marital agreement— where the success rate is generally low to begin with. But it did not change the law.
Here, wife submitted no evidence that husband lacked the intent to modify the agreement when he allegedly promised to do so. Fraudulent intent cannot be inferred merely from the fact of nonperformance. (Brown v Lockwood, 76 AD2d at 733.) Furthermore, wife’s argument that the parties did not intend to be bound by the agreement as written is belied by the unambiguous terms of the agreement, which states that it was to be effective “as of the date it is executed by both parties,” “shall be binding” and may be incorporated into any final judgment of divorce. (See agreement at 8 [“Effective Date of Agreement”]; id. at 10 [“Binding Effect”]; id. at 11 [“Submission to Court”].) The agreement also contains an integration clause (id. at 10 [“Entire Understanding”]) and states that it may not be modified absent a writing signed by both parties or as ordered by a court. (Id. at 11 [“Modification”].)
And the agreement is not silent as it relates to the financial terms of maintenance and child support — the provisions wife claims were saved for later agreement. The parties expressly waived their right to receive maintenance in a section of the agreement entitled “Maintenance”; the subtitle is “Mutual Waiver.” The parties each represented in that section that “[i]t is the mutual desire of the parties that hereafter they shall each maintain and support themselves separately and independently of the other.” They then proceeded to release and discharge each other, in separate paragraphs of that section, from any claim or right to receive temporary or definite alimony, maintenance or support. To hammer the point home, wife also acknowledged that “by the execution of [the] Agreement she cannot at any time in the future make any claim against Husband for alimony, support, or maintenance of any kind what *1060 soever for herself.” As to child support, the parties also expressly agreed that “no demand for child support payments will be made by either party upon the other.”[2] Therefore, wife has not met her burden of establishing that the agreement was fraudulently induced. As a result, the agreement is valid and enforceable. The parties are to contact the court by September 10, 2013 to schedule a conference to discuss all other outstanding matters in this action. Any other relief requested but not specifically addressed in this decision is denied.

. See e.g. Martha Neil, “Landmark” NY Appeals Court Ruling Voids Prenup Due to Millionaire’s Oral Promises to Wife-to-be, ABA J, Mar. 11, 2013.

. Husband concedes this provision of the agreement is unenforceable because it does not comply with the requirements of the Child Support Standards Act, but correctly points out that the remainder of the agreement may be severed and enforced. (See Seligman v Seligman, 78 Misc 2d 632 [Sup Ct, Kings County 1974] [separation agreement may be deemed valid separate and apart from support provisions].) Although the agreement contains no sever-ability clause (cf. Christian v Christian, 42 NY2d at 73), the language of the agreement reflects, and the parties’ testimony established, the parties’ intent to be bound by the agreement notwithstanding the need to alter certain financial provisions. (See Rubin v Rubin, 72 AD2d 810 [2d Dept 1979].) Indeed, it is wife’s argument that the parties themselves were to modify the support provisions.